# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARPLE NEWTOWN SCHOOL | : | CIVIL ACTION |
| DISTRICT, | : | |
|       Plaintiff, | : | |
| | : | |
|   v. | : | NO. 07-0558 |
| | : | |
| RAFAEL N., PARENT AND | : | |
| NATURAL GUARDIAN OF R.N., | : | |
|       Defendant. | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                **August 23, 2007**

This case involves a due process challenge to a student's current education placement under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. § 1400 *et seq*.[1]  The court held oral argument on this petition for review on May 22, 2007. Upon reviewing the administrative record in this case, I have concluded that the hearing officer's findings of fact are erroneous.  The record does not support the District's position that it accommodated Student's severe language and medical needs or prepared him to transition into the community.  For the reasons discussed below, I will affirm the appeals panel's decision.

---

[1] The Individuals with Disabilities Education Act ("IDEA") ensures that children with disabilities have access to a free appropriate public education.  20 U.S.C. § 1400(c)(3).  If parents disagree with the school district's evaluation, placement, or provision of a free and appropriate education to their child, they may request a due process hearing conducted by a hearing officer.  22 PA. CODE § 14.162(b).  The parent or the school district can then appeal the hearing officer's decision to the special education appeals panel.  Id. at § 14.162(o).  After the appeals panel renders a final administrative decision, either party has the right to bring a civil action in federal or state court.  20 U.S.C. § 1415(i)(2).  This court therefore has jurisdiction to review the decision of the appeals panel.

I.      BACKGROUND

R.N. ("Student") is a Spanish speaking seventeen-year old boy with mild to moderate mental retardation and intractable epilepsy that causes severe seizures and is difficult to treat.  Student is eligible for special education services under the IDEA and for English as a Second Language ("ESL") instruction under Pennsylvania law.[2]  Student immigrated to the United States from the Dominican Republic in 1998 when he was nine years old after the deaths of his mother and grandmother.  Student functions, cognitively and academically, as well as a child at the developmental age of four.  Student's speech is extremely concrete and characterized by the use of phrases and short, simple sentences. While his language is impaired in both Spanish and English, Student is stronger in Spanish.

In addition to his mental retardation, Student's language difficulties are further compounded by frequent seizures.[3]  From 2000 to the present, Student suffered from approximately five to ten seizures a month.  Student takes several prescribed medications for his epilepsy, which makes him tired and impedes his ability to concentrate and remember.  Student's treating physician testified that there is a less than 10% chance of total seizure control but that with aggressive medication management and new treatments,

_____

[2]" Every school district shall provide a program for each student whose dominant language is not English for the purpose of facilitating the student's achievement of English proficiency and the academic standards under § 4.12 (relating to academic standards). Programs under this section shall include appropriate bilingual-bicultural or English as a second language (ESL) instruction." 22 PA. CODE § 4.26.

[3] The experts who evaluated Student noted that it was difficult to determine whether Student's epilepsy or mental retardation more severely limited his language development.  See e.g. N.T. Sept. 14, 2006, pp. 497-99.

-2-

there is a good chance for improvements in Student's seizure control.

Student's father, R.N., Sr. ("Parent"), is also from the Dominican Republic and now resides in Philadelphia, Pennsylvania.  Parent is Spanish-speaking and cannot speak or read English; Parent is also unable to read Spanish.  In January 1999, the Commonwealth placed student in the custody of the Philadelphia Department of Human Services ("DHS") where he remains to this day.  However, Parent retains his parental rights.

Student became a resident of Marple Newtown School District (the "District") in November 2001 when DHS placed him at Don Guanella Village[4] within the district.  During the 2001-2002 school year, Student attended the Francis Harvey Green School in a life skills support program.

### A.    English as a Second Language Instruction

Student immigrated to the United States in 1998.  The Philadelphia school district conducted an initial language assessment on April 20, 1999.  This report identifies Student's greatest need as language because he only speaks Spanish and virtually no English.  The report notes that Student "made little progress this year due to the language barrier."  Administrative R., Ex. 33, P-15, p. 4.  Student's first Individualized Education Program ("IEP") on November 17, 1999 provided for ESL two periods a day.  On October 20, 1999, a comprehensive evaluation report from the School District of

---

[4] Don Guanella Village is a residential facility owned and operated by the Catholic Social Services and located in Springfield, Pennsylvania.  It is not affiliated with the District or its educational program.

Philadelphia recommended placement in a learning support program because Student had failed several grades; had made no progress in his regular classroom or ESL classes; and failed to participate in classroom or ESL class activities.  On June 12, 2001, Student's IEP stated that he did not perform well in his current placement because of his limited English skills.  Although he attended ESL for two periods a day, he did not show progress in this setting either and relied on other students to communicate his needs (e.g. to go to the bathroom or get a drink) to the teacher.

On August 24, 2001, Student was placed in a full-time special education classroom at the Frances Harvey Green School.  His October 19, 2001 IEP provides for "pull-out" ESL instruction[5] for two hours a week.  Prior to the start of the 2002-2003 school year, the District transferred Student from the Francis Harvey Green School to a life skills program at the Don Guanella School, which was located at the same facility as Student's residence.

The program at Don Guanella is almost exclusively in English.  Student's teacher does not speak Spanish, nor does any other student in the classroom.  On November 20, 2002, the District removed direct ESL from Student's IEP because Student was not making progress.  The IEP team determined that Student's language needs would be

---

[5] "Pull out" services require taking a student from the classroom setting and working with the student individually or in a small group.  "Push in" services do not require removing the student from the classroom; instead, the teacher or therapist comes into the classroom and works with the student and the student's teacher within the student's curriculum.  Dr. Karen Morante, the District's bilingual psychologist, testified that "pushing-in" services for a student with limited cognitive functioning is more beneficial because it increases the student's ability to acquire and retain the information.  Notes of Testimony ("N.T."), Sept. 15, 2006, pp. 573-74.

better addressed in the classroom setting by the teacher and a speech therapist.

At the Don Guanella School, Student is not assisted in the classroom by a translator, although his classroom teacher for the 2005-06 year presented Student with bilingual picture cards.  Student's IEP for the 2002 through 2005 academic years did not incorporate or reference ESL instruction.  Instead, the District replaced ESL with speech and language therapy in a group setting for thirty minutes each week.  Jennifer Copus began providing ESL consultation to Student's classroom teacher, Richard Joseph, during the spring of the 2005-06 school year.  She visited the classroom twice in the spring of 2006 and recommended that Joseph use flashcards to build Student's English vocabulary, ask student to speak and repeat words and phrases, and label items around the classroom.

**B.     Accommodation for Epilepsy**

Student's epilepsy affects his cognitive functioning and his educational program.  His disorder and the medication he takes to control his condition, including Keppra, Depakote, and Tileptal, makes him tired.  Student cannot participate in the curriculum when he is having an attack and often needs to sleep after a seizure.  While Richard Joseph, Student's teacher in 2005-06, attempted to make up for missed time by reading to Student during lunch breaks, Joesph testified that generally missed time was missed time, particularly since Student returned to his residence after school.  Notes of Testimony ("N.T."), Sept. 19, 2006, pp. 839-40.  In addition to missing classroom instruction, Student's medical condition also impedes his ability to acquire new information and

retain the material he has learned.  The nurses who work at Student's residential placement share information with the school regarding his condition, however, a neurological specialist has not been incorporated into Student's IEP team.

### C.      Procedural History

The District failed to communicate with Parent in his native language until 2006; specifically, the District never provided Parent with invitations to meetings, notices, or procedural safeguards in Spanish.  Only in 2005, with the assistance of his counsel, did Parent begin to appreciated the shortcomings in his son's public education.

On June 27, 2006, Parent filed a due process complaint with the Office of Dispute Resolution challenging the educational program offered by the District and seeking compensatory education for the 2003-2004, 2004-2005, and 2005-2006 school years.  The hearing officer held a due process hearing and concluded on October 25, 2006 that the District had not denied Student a free and appropriate education.  On November 17, 2006, Parent appealed the hearing officer's decision.

On December 20, 2006, an appeals panel of the Office of Dispute Resolution partially affirmed and reversed the decision of the hearing officer and found that the District had denied Student a free and appropriate education.  The appeals panel ordered the District:

> (1)     to develop an IEP consistent with the findings in this order, including a transition plan designed to assist Student in moving to the adult world; instruction that addresses Student's language needs with instruction from someone who is bilingual; pairing Student with a non-disabled Spanish

speaking peer to model behaviors; and accommodating Student's significant health and medication conditions;

(2)     consider placing Student in a location where he can interact with non-disabled Spanish speaking peers;

(3)     perform a situational assessment within thirty days;

(4)     perform a Speech/Language Evaluation within thirty days using a bilingual evaluator to determine Student's proficiencies in Spanish and English;

(5)     perform an Occupation Therapy Evaluation within thirty days;

(6)     provide placement process documentation in a language Parent can understand so Parent can participate in a meaningful way, which may include procuring the services of an English-Spanish translator to explain the information to Parent orally

(7)     provide Student with compensatory education, to be determined by calculating the number of hours in the school day (to the nearest quarter hour) and multiplying that number by the number of days in each school year and including a ten-day offset to give the District time to arrange for compensatory education;

(8)     develop compensatory education and IEP for transition services, specifically community based instruction.

The District exercised its right to judicial review of the final administrative decision by filing a civil action in the Commonwealth Court of Pennsylvania on January 23, 2007.[6] On January 26, 2007, the District filed an Application for Stay with the state court. On February 9, 2007, Parent filed a Notice of Removal and on March 5, 2007, he moved this court to deny the District's application for a stay and moved for a preliminary injunction

---

[6] See n. 1 *supra*.

to compel the implementation of the appeals panel's order.  On March 8, 2007, the court granted defendant's motion for a preliminary injunction and ordered the District to immediately comply with and implement all provisions of the appeals panel's Opinion and Order and develop an IEP for Student within fifteen days.

The District held another IEP meeting on March 28, 2007.  See Def's Br. Opp'n Pet. Review Ex. A. Despite the court's order, a new IEP was not finalized and implemented until April 23, 2007.

## II.     STANDARD OF REVIEW

The IDEA requires that the district court, in reviewing the rulings of the appeals panel, should receive the records of the administrative proceedings; hear additional evidence at the request of a party; and grant appropriate relief based on the preponderance of the evidence.  20 U.S.C.§ 1415(i)(2)(C). The court must give "due weight" to the records when reviewing the matter.  Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).

The appeals panel must conduct an impartial review of the hearing officer's decision and make an independent decision.  See 20 U.S.C. § 1415(g)(2). The Third Circuit has explained that the appeals panel exercises a plenary review although it is required to "defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).  The district court should give

-8-

"'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." Id. at 530.

## III.   DISCUSSION

### A.   Statute of Limitations

The IDEA requires that a parent request a due process hearing within two years of the date the parent "knew or should have known about the alleged action that forms the basis of the complaint...". 20 U.S.C. §1415(f)(3)(C).  There are two exceptions.  The timeline will not apply if the parent was prevented from filing a complaint because (1) the local educational agency makes "specific misrepresentations" that it resolved the problem at the basis of the complaint or (2) the agency withheld information from the parent that was required to be provided by the parent." Id. at (f)(3)(D).

The hearing officer found that Parent met the enumerated exceptions by finding that almost all the correspondence between District and Parent was in English; the District did not always provide translation services at IEP meetings; and that Parent may have signed notices he did not understand.  Hearing Officer's Decision ("Decision") at p. 7.  On the basis of "this disturbing pattern of insensitivity to that fact that the Parent is monolingual Spanish speaking and illiterate," the hearing officer held that Parent had met his burden of proof and should be permitted to proceed on the compensatory education

claim beyond the two-year period prior to his request for a due process hearing.  Id.  The

appeals panel upheld this conclusion.  Special Education Appeals Panel Opinion and

Order ("Opinion and Order") p. 17.

This court finds no reason to disturb the decision of the hearing officer and the

appeals panel on this issue.  The IDEA requires notice to the parents of disabled children

be provided in the native language of the parents.  See 20 U.S.C. § 1415(b)(4) and (d)(2);

20 U.S.C. § 6312(g)(2).  The record shows that the District failed to do so and therefore,

Parent is permitted to proceed on his claim.

**B.      Free Appropriate Public Education**

In order to determine whether District denied Student a free and appropriate public

education ("FAPE"), the court must determine whether the Student's IEP was reasonably

calculated to enable the child to receive meaningful educational benefits.  Bd. of Educ. v.

Rowley, 458 U.S. 176, 206 (1982).  "The education provided must be sufficient to confer

some educational benefit upon the handicapped child.".  L. E. v. Ramsey Bd. of Educ.,

435 F.3d 384, 390 (3d Cir. 2006) (quotations omitted).  Since Student, as represented by

Parent, challenged the IEP, he bore the burden of proof in the administrative hearing as

the party seeking relief.  Schaffer v. Weast, 546 U.S. 49, 62 (2005).[7]

**(1)      ESL instruction**

Federal regulations require an IEP team to take the language needs of the child into

---

[7] The Third Circuit has acknowledged the Schaffer changes its own rule that the District bore the burden of demonstrating compliance with the IDEA.  L. E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006).

account.  34 C.F.R. § 324(a)(2)(ii).  Pennsylvania law also mandates that school districts provide programs for students whose dominant language is not English to facilitate the student's English proficiency through bilingual-bicultural or ESL instruction.  22 PA. CODE. §4.26, see also 24 PA. STAT. ANN. §9-972.1(b) (requiring Intermediate Units to furnish auxiliary services to students including English as a second language instruction). The appeals panel, while affirming the hearing officer's determination that there was no jurisdictional basis for Parent's ESL claim under Pennsylvania law, found that Student's IEP must be amended to receive instruction from someone who can communicate in Student's native language until the District can demonstrate that Student has attained enough English proficiency for an English only classroom.[8]  The appeals panel also ordered the District to develop compensatory education and an IEP for English language proficiency and to conduct a speech and language evaluation with a bilingual evaluator to determine Student's relative proficiencies in Spanish and English and determine if Student still needs speech and language therapy.

I find that the hearing officer's decision to deny Student's ESL claim is erroneous for two reasons.  First, she wrongly concluded that she did not have a jurisdictional basis to hear the claims pertaining to violations of Pennsylvania regulations pertaining to ESL services.  The IDEA defines the term "free appropriate public education" to include the

---

[8] The appeals panel affirmed the hearing officer's decision that she did not have jurisdiction over Student's state law claims, yet ordered the district to provide instruction in his native language.  Presumably, this portion of the appeals panel's order was based on its jurisdiction under federal law to take the language needs of a child into account when developing an IEP.

-11-

provision of special education and related services that meet the standards of the State's

educational agency.  20 U.S.C. § 1401.  The Third Circuit has held that a predecessor of

the IDEA, the Education of the Handicapped Act, incorporates state law standards.

Board of Educ. v. Diamond, 808 F.2d 987, 992 (3d Cir. 1986).   Federal courts in the

Third Circuit have applied this holding to the IDEA.  John T. v. Delaware County

Intermediate Unit, No. 98-5781, 2000 U.S. Dist. LEXIS 6169, at *14-15 (E.D. Pa. 2000)

(finding that the IDEA permitted plaintiffs to enforce Pennsylvania education statutes in

federal court); Frith v. Galeton Area Sch. Dist., 900 F. Supp. 706, 712 n.9 (M.D. Pa.

1995) ("Federal law incorporates state standards, and a school district may violate the

IDEA if it fails to satisfy the more stringent state law requirements.").  Other Circuit

Courts have also found that the IDEA incorporates state law standards, particularly when

these statutes impose a higher obligation on the school district.  See Blackmon v.

Springfield R-XII Sch. Dist., 198 F.3d 648, 659 (8th Cir. 1999) (collecting cases),

Erickson v. Albuquerque Pub. Sch., 199 F.3d 1116, 1122 (10th Cir. 1999). This court has

jurisdiction under the IDEA to determine whether the District satisfied its state law

obligations to Student.

The second reason the hearing officer's decision was erroneous is that she

determined that the District was providing a meaningful "push-in" ESL program.  While

there does seem to be a professional dispute concerning whether "pull-out" ESL services

are preferable to "push-in" services, I agree with the appeals panel's finding that

"[a]lthough District asserts that it provided a 'push-in' program for English instruction, we see no description of it, nor how such a program was adapted to the unique needs of this Student's significant cognitive disability."  Opinion and Order p. 12.  The appeals panel also noted "[g]iven Student's cognitive limitations and the late age at which Student came to face demands for communication in English, Student is unlikely to become proficient in English without significant explicit instruction.  Id. p. 9.  Dr. Alexandra Goldwater, an independent bilingual evaluator, also questioned how the District would be able to provide "push-in" ESL services in the classroom to increase Student's English language skills because Student's classroom teacher is not certified in ESL.  See Administrative R. Ex. 32, S-29, p. 5.  After holding a hearing on the petition for review and reviewing the administrative record, the notes of testimony from the due process hearing, and expert reports, I find that Student has shown by a preponderance of the evidence that the District did not provide Student an IEP designed to meet his language needs.

The hearing officer found that Student's IEPs show that he made progress.  This finding is not supported by the record.  A review of Student's IEPs from 2002 to 2006 shows no meaningful progress in his acquisition of English.  In fact, Student qualified for an extended school year ("ESY") program starting in 2003 due to regression concerns.  The IEPs note the continual language barriers Student experienced in the English-only classroom:

- In November 2002, his IEP states that while Student can copy words and sentences he "shows no real understanding of the English language." Administrative R., Ex. 32, S-3, p. 2.  Student can rotely count to 20 in English but is inconsistent when identifying numbers 1-20.

- In his next IEP on November 2003, the report states that "[Student] communicates in Spanish and comprehends and expresses limited English. The language barrier within the school setting has been a challenge for [Student] both academically and socially, for he shows no true understanding of the English language."  Administrative R., Ex. 32, S-5, p. 2.  While noting that Student can say 20-30 English words, his long term memory and understanding of these English vocabulary words is limited. He can rote count inconsistently to 20 and can independently write numbers 1-10.  The language barrier continues to prove problematic and Student is unable to follow verbal and written directions without one to one support. Student is eligible for ESY services because he shows signs of regression. Yet, Student continues to try to communicate with staff and his peers and is generally friendly and happy although he becomes frustrated when he is not understood.

- In November 2004, the IEP again focuses on Student's language barrier difficulties while noting that Student is using picture identification to increase his English vocabulary.  He is able to rote count to 25 inconsistently.  Student is again eligible for ESY services because he is regressing.

- In November 2005, the District provided the first bilingual IEP.  This notes that Student's "academic achievement is severely limited compared to his same-age peers" due to his cognitive skills, seizure disorder, and his limited ability to understand and communicate in English.  Administrative R., Ex. 32, S-16, p. 3.  Student again qualifies for ESY due to regression.

- In March 2006, Student's IEP is once again bilingual and notes that procedural safeguards have been provided to Parent in Spanish.  Student's ability to communicate in English is limited and he can comprehend routine phrases such as "bathroom" and "lunch." Student can count from one through ten.  This IEP provides for a thirty minute consultation between an ESL consultant and Student's classroom teacher once a month.  Once again, Student qualified for ESY services because he showed signs of regression.

-14-

Defendant's expert, Dr. Alexander Goldwater, reviewed Student's IEPs and found them inadequate because they lacked instructional direction and planning.  Dr. Goldwater notes that "[a]ll IEPs contain goals to increase English vocabulary but without particular purpose or scope, accommodation of [Student's] status as an [Limited English Proficient student], targeted lesson planning, or ESOL instruction....As further evidence that all prior IEPs lack tangible goals and measurements, they stay essentially the same yearly. Yet, the notes show regression by Student over time."  Administrative R., Ex. 32, S-29, p. 4; see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995) (noting that "if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate.") Dr. Goldwater noted that Student has been able to adjust to a completely English speaking environment at Don Guanella and stressed that his language needs must be prioritized and fulfilled through direct ESL instruction that incorporates conversation and social interaction instead of repetition and attempted memorization to capitalize on Student's strengths.  Id. at p. 12.

Further, the appeals panel found Student's IEPs inappropriate because Student was not evaluated in his native language.  This violates the IDEA.  20 U.S.C. § 1414(b)(3)(A)(ii) (requiring that evaluations must be "provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so

provide or administer"); 34 C.F.R. § 300.304(c)(1)(ii) (stating that evaluation must be "administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer).  It was clearly feasible to evaluate Student in his native language, as the administrative record includes reports from bilingual evaluators including Drs. Morante, Goldwater, and Ferreira, and not doing so violates the IDEA.

While the District argues that Student's lack of progress in the acquisition of English is due to his cognitive limitations, Student's evaluators consistently testified that appropriate, individualized, and intense ESL instruction would help Student bridge the gap between his fluency in Spanish and his fledgling English language skills.  Dr. Goldwater opined that Student has learned English and that he is capable of more.  N.T. Sept. 14, 2006, p. 380.  Dr. Ferreira testified that there must be a structured and directed programmatic effort to teach Student English and noted that "if [Student] has the capacity to learn Spanish, a language, he has the capacity to learn the language English."  Id. pp. 474-75.

I find that the District denied Student FAPE because Student's IEP was not reasonably calculated to address his language needs and ensure he receive a meaningful educational benefit.  Rowley, 458 U.S. at 206.  I will affirm the appeals panel's Opinion and Order.

(2)      **Least restrictive environment**

The IDEA requires that students be educated in the least restrictive environment

("LRE"), which means that "[t]o the maximum extent appropriate, children with

disabilities...are educated with children who are not disabled, and special classes, separate

schooling, or other removal of children with disabilities from the regular educational

environment occurs only when the nature or severity of the disability of a child is such

that education in regular classes with the use of supplementary aids and services cannot

be achieved satisfactorily."  20 U.S.C. § 1412(a)(5).  The Third Circuit has adopted a

two-part test to determine whether a school district has satisfied the main-streaming

requirement of the IDEA.  "First, the court must determine whether education in the

regular classroom, with the use of supplementary aids and services, can be achieved

satisfactorily.  Second, if the court finds that placement outside of a regular classroom is

necessary for the child to benefit educationally, then the court must decide whether the

school has mainstreamed the child to the maximum extent appropriate, i.e., whether the

school has made efforts to include the child in school programs with nondisabled children

whenever possible."  Oberti v. Board of Educ., 995 F.2d 1204, 1215 (3d Cir. 1993)

(citations omitted).  The hearing officer ruled that Parent failed to address this claim by

not presenting any evidence at the hearing and considered the issue dropped.  The appeals

panel reversed the hearing officer and found that Student's placement was highly

restricted and lacked interaction with non-disabled peers.  The appeals panel directed the

District to consider placing Student in a location where he can interact with non-disabled Spanish speaking peers.

While the due process hearing did not focus on the appropriateness of Student's placement at the Don Guanella School, Parent did introduce evidence that Student would benefit from exposure to higher functioning Spanish speaking peers in a real world setting.  See N.T. Sept. 15, 2006 p. 614; Sept. 14, 2006 p. 359.  Dr. Morante also agreed that pairing Student with non-disabled Spanish speaking student peers would be beneficial.  Administrative R., Ex. 32, S-21, p. 9.

I will affirm the appeals panel's recommendation to pair Student with non-disabled Spanish speaking peers and to consider placing Student in a location where Student can interact with non-disabled peers.

### (3)    Accommodation for Student's Seizure Disorder

There is ample evidence that Student's severe and difficult to treat seizure disorder has affected his education.  Student sleeps through, on average, a couple of hours of school a week and the prescriptions that help him control his seizures impede his ability to concentrate, remember, and retain information.  The hearing officer held that Parent failed to present any evidence of specific accommodations that are lacking from Student's educational program and that the District adequately accommodated Student's medical condition by communicating with the nurses who work at the residential facility where Student resides.  The appeals panel overturned the hearing officer and found that the IEPs

need to specify specific means of communication between Student's educational and medical teams as well as compensating Student for the portions of the school day where he is asleep or unresponsive due to a seizure or medication.

The hearing officer's determination that Parent had failed to present specific accommodations is belied by the record.  While the District asserts that it accommodated Student's medical condition by providing "extra time" with the classroom teacher, the record only indicates that Student's 2005-06 classroom teacher, Richard Joseph, attempted to make up the missed time by reading to Student during some lunch breaks but generally "missed time was missed time" because Student returned to his residence after school.  N.T., Sept. 19, 2006, pp. 839-40.  There is no evidence that the District consistently accommodated Student's disorder by providing additional instruction time to compensate for missed instruction.  Other school districts have accommodated students in this way.  See Ariel B. Ex rel. Deborah B. v. Fort Bend Indep.Sch. Dist., 428 F. Supp.2d 640, 660-61 (S.D. Tex. 2006) (noting that the school district adjusted the schedule and provided for after-school tutoring for a student whose sleep disorder interfered with her ability to attend classes on a normal schedule).

The hearing officer and the District have also virtually ignored the testimony of Dr. Pedro Ferriera, who made several specific recommendations for accommodations.  See N.T. Sept. 14, 2006, pp. 466-472, 497-99.  Dr. Ferriera encouraged involving a neurologist on Student's IEP team.  Dr. Susan Herman, Student's treating physician, has

not been included in Student's education planning.  Dr. Ferriera stressed that permitting Student to sleep after a seizure was a kind practice that should continue, but was not a true accommodation.  While deferring to the educators to select appropriate techniques to meet Student's needs, Dr. Ferriera testified that the educators must develop an approach that takes into account Student's failure to acquire information.  He suggested that staff might be able to "rekindle" Student's learning experiences in the dorm at night in order to counter-balance the fatigue Student experiences in the classroom.  Id.  at 498-99.  Dr. Ferriera emphasized that since Student learned Spanish reasonably well, he saw no reason why he could not also learn English.  He also recommended occupational therapy to develop fine motor skills to prepare Student for vocational training.

Parent has presented significant evidence that the District failed to accommodate Student's disability.  While the medical experts deferred to the educators when asked to recommend specific strategies, they did give guidance that Student's learning experiences should be rekindled as frequently as possible and that Student's medical team must consult on Student's IEP.  They stressed that sleeping was "kindness" and not an accommodation.  I will affirm the appeals panel's decision.

### (4)     Transition Planning

An IEP must contain a statement of transition services for students older than sixteen that includes measurable post-secondary goals related to training, education, employment, and independent living skills.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).

Specifically, the IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" and the transition services needed to assist the student in attaining these goals.  Id.  The regulations to the IDEA further define the requirements for appropriate transition services.  The services must be "results-oriented" in facilitating the child's movement from school to post-school activities, which may include postsecondary or vocational education, integrated employment, and independent living.  34 CFR 300.43(a)(1).  The services must also be based on the individual student's needs, taking into account his strengths, preferences, and interests, and include instruction, related services, community experiences, employment, and daily living skills.  Id. at (a)(2)(i)-(v).  Transition services must begin no later than age sixteen but can start as early as fourteen, when it is appropriate for the individual student.  34 C.F.R. § 222.50(1)(iv) (defining IEP).

The appeals panel concluded that Student's IEP was inappropriate because it did not include a transition plan, a community component to model behavior with non-disabled peers, and lacked a situational assessment (which the District has subsequently conducted).  The Panel also found the transition plan inadequate because it did not articulate the desired outcome.  In sum, the Panel concluded that "the plan is a plan to unspecified living and working environments based upon some general notion of services in which the Student may participate rather than what Student needs to achieve an

outcome....[B]ecause the IEP does not articulate a desired result for this Student, there is no way to develop a meaningful transition plan.  This omission, given the Student's age and immediate approach to adulthood, renders the IEP inappropriate....[T]he District expects Student to derive some vague benefit from services that are neither individualized, nor outcome oriented."  Opinion and Order p. 9.

A review of Student's IEPs show that while they do incorporate vocational and independent living skills, the goals are vague and do not capitalize on Student's strengths or specific interests.  Beginning at age fourteen, the IEPs incorporate pre-vocational goals including using the school's apartment to model daily living skills and working in the school's workshop twice a week for pre-vocational training.  See Administrative R., Ex. 32, S-5, S-7.  Beginning at age 16, Student's IEPs include transitional services.  In his November 2005 IEP, the District notes that post-secondary education and training will not be appropriate.  To build vocational skills, Student will participate in the school's workshop for forty minutes twice a week with the goal of completing twenty-five pieces requiring a four-step assembly within twenty minutes at eighty percent accuracy.  Id. Ex. S-16, p. 12.  He will also work on domestic activities in the School's apartment for forty-five minutes one time a week, with the goal of independently creating three meals or snacks following a four to six step process.  Id. p. 11.  His next IEP in March 2006 provides for the identical vocational and independent living goals.  See Id. Ex. S-23, pp. 13-14.

The IEPs state generic goals that have remained static from year to year.  None of Student's vocational or independent learning outcomes contains a community component. The IEPs also do not include a component to prepare Student for medical self-monitoring. Most importantly, the IEPs do not take into account Student's strengths or preferences.  I will affirm the appeals panel and find that the District did not provide a meaningful transition plan for Student once he turned sixteen.

### (5)    Occupational Therapy

The appeals panel ordered the District to conduct an occupation therapy evaluation.  The District has performed this evaluation and the court therefore considers the issue moot.

### C.    Compensatory Education Award

Compensatory education is a remedy designed to cure the deprivation of a child's right to FAPE.  Lester H. v. Gilhool, 916 F.2d 865, 873 (3d Cir. 1990) cert. den. 499 U.S. 923 (1991).  "[T]he right to a compensatory education accrues when the school knows or should know that its IEP is not providing an appropriate education."  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 249 (3d Cir. 1999).  Awarding compensatory education allows a disabled student to continue receiving educational benefits beyond the age of twenty-one to make up for an earlier deprivation.  Id.

Children are entitled to "compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify

the problem. " <u>M.C. ex rel. J.C. v. Central Regional Sch. Dist.</u>, 81 F.3d 389, 397 (3d Cir. 1996). The Commonwealth Court of Pennsylvania recently rejected this approach and addressed the appropriate standard for a compensatory education award under the IDEA. <u>B.C. v. Penn Manor Sch. Dist.</u>, 906 A.2d 642 (Pa. Commw. Ct. 2006).[9] The court adopted a more flexible, equitable standard stating that "where there is a finding that a student is denied a FAPE and the Panel determines that an award of compensatory education is appropriate, the student is entitled to an amount of compensatory education reasonably calculated to bring him to the position that he would have occupied but for the school district's failure to provide a FAPE....[D]oing so may require awarding the student more compensatory education time than a one-for-one standard would, while in other situations the student may be entitled to little or no compensatory education, because (s)he has progressed appropriately despite having been denied a FAPE." <u>Id.</u> at 650-651.

The appeals panel, applying the Commonwealth Court's standard, ordered compensatory education for three academic year to be calculated by the number of hours in the school year times the number of days in the school year because it determined that nothing short of one to one compensation would correct Student's denial of FAPE. Based on the above findings that Student's IEPs did not address his severe language

---

[9] This Court is bound by the Third Circuit's construction of the IDEA, not the Pennsylvania Commonwealth Court's. However, while the District urges the court to apply the Commonwealth Court standard, the appeals panel applied this standard and still held that "nothing short of one to one compensation is likely to provide Student with the opportunity to gain what has been lost as a result of the denial of FAPE because of the Student's age, cognitive disability and continued deficiency in English." Opinion and Order p. 13.

deficiencies, accommodate his seizure disorder, or include an appropriate transition plan, I will affirm the appeals panel's order.

### D.     Student's Counterclaim

Student filed a counterclaim against the District asserting claims under the IDEA, the Rehabilitation Act, the Americans with Disabilities Act, Title VI of the Civil Rights Act, Equal Educational Opportunity Act, and Section 1983 of the Civil Rights Act and seeking injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs.  I will deny Student's request for punitive damages as the District's conduct was not willful or wanton.  I will award Student reasonable attorney's fees pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I).  Student is directed to file a petition for fees within ten days of this memorandum and order.  The other issues in the counterclaim were not briefed or argued by the parties and the relief sought by the counterclaim will be granted by the compensatory education.

## IV.    CONCLUSION

For the reasons stated above, I will affirm the appeals panel's order.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARPLE NEWTOWN SCHOOL  :  CIVIL ACTION
DISTRICT,                              :
          Plaintiff,      :
                        :
      v.                          :  NO. 07-0558
                        :
RAFAEL N., PARENT AND      :
NATURAL GUARDIAN OF R.N.,  :
          Defendant.     :

**O R D E R**

    **AND NOW**, this 23rd day of August, 2007, upon consideration of Plaintiff's

Petition for Review (Document No. 1), the responses thereto and after hearing oral

argument on the petition, it is hereby **ORDERED** that the petition is **DENIED** and the

order of the Appeals Panel is affirmed.  The School District is **ORDERED** to implement

all aspects of the Appeals Panel's order.

    Defendant is entitled to reasonable attorneys fees pursuant to 20 U.S.C. §

1415(i)(3)(B)(i)(I).  Defendant is **ORDERED** to submit a petition for fees and a proposed

order within ten (10) days of this order.  Plaintiff shall respond to the petition within ten

(10) days of service.

    The Clerk of Courts is directed to close this case.

                 BY THE COURT:

                 /s/ Lawrence F. Stengel
                 LAWRENCE F. STENGEL, J.